**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THE PROPERTY MANAGEMENT GROUP, LTD., B.H. HOLDING CORP., CORE ASSET MANAGEMENT, LLC, GABRIEL FALCO, ELBA GONZALEZ, PENNSYLVANIA APARTMENT ASSOCIATION, EAST, ABOB'S TOWING, INC., SIANI'S TOWING AND RECOVERY, LLC, LEWIS BLUM TOWING, INC., | : : : : | |
| Plaintiffs, | : : | CIVIL ACTION No. 17-1260 |
| v. | : | |
| CITY OF PHILADELPHIA, JIM KENNEY, PHILADELPHIA POLICE DEPARTMENT, and RICHARD ROSS, JR., | : : : | |
| Defendants. | : : | |

**May 23, 2017**                                                                                       **Anita B. Brody, J.**

<u>**Memorandum**</u>

Plaintiffs, a coalition of private parking lot owners and towing companies, have towed the City of Philadelphia into court on account of a recently enacted ticket-to-tow ordinance. The ordinance requires a neutral City official, like the police, to verify a parking violation and issue a ticket before a vehicle may be towed. The parking lot owners and towing companies allege this mandate is more than just a speed bump, arguing the ordinance is preempted by state law and that it functions as an unlawful taking and deprivation of procedural due process. The City, claiming this case is a dead end, moves to dismiss the Complaint. Regrettably for Plaintiffs, the wheels have come out from under them; their Complaint reaches the end of its road.

1

# I.    BACKGROUND AND HISTORY OF THE ORDINANCE

On the streets of Philadelphia, as frequently reported in the press, parking is an intractable problem.[1] The reputation of private towing companies has been tarnished: media accounts detail the vilification of law-abiding tow truck companies, given a bad name by their unscrupulous and predatory brethren who tow legally parked vehicles.[2] Municipal regulations have permitted tow truck drivers to be "judge, jury, and executioner" of parking violations, meaning the tow driver is permitted to both determine if a car is parked illegally and collect fees for towing it. This system has led to widespread abuse, perpetrated by a small number of towing companies, and a chorus of civilian complaints. City Council Hr'g Tr. 50:18-51:20, Nov. 29, 2016.[3]

Parking and towing regulation in Philadelphia is governed by state law and by municipal ordinance, promulgated by the City Council.[4] Section 3353(b)(1) of the Pennsylvania Vehicle Code makes it unlawful for anyone to park a vehicle on private property without the consent of the owner. 75 Pa. Cons. Stat. Ann. § 3353. To protect a parking space owner's exclusive right of possession over his or her privately owned spaces, this statute also grants private property

---

[1]      *See* Dana DiFilippo, *Tow Companies Ask for Injunction to Stop Philly's New Ticket-to-Tow Law,* Newsworks (Mar.  27, 2017), http://www.newsworks.org/index.php/homepage-feature/item/102480-tow-companies-ask-for-injunction-to-stop-phillys-new-ticket-to-tow-law ("[T]he battle for parking has gotten so cutthroat in some congested neighborhoods that it became fodder for a reality TV show called 'Parking Wars' . . ."); *see also* Compl. 1-4, ECF No. 1.

[2]       *See* Greg Argos, *Is Lew Blum the Most Hated Man in Philadelphia?*, CBS Philadelphia (May 1, 2017, 11:15 PM), http://philadelphia.cbslocal.com/2017/05/01/is-lew-blum-the-most-hated-man-in-philadelphia.

[3]       A copy of the transcript of the City Council Hearing on Bill 160682, November 29, 2016, which discussed amending the towing ordinance and the attendant parking problems in Philadelphia, is attached as Ex. B to Defs.' Mot. Dismiss, ECF No. 5. It is also available at http://legislation.phila.gov/transcripts/Public%20Hearings/streets/2016/ss112916.pdf

[4]       Vehicle regulation in the Commonwealth of Pennsylvania is generally governed by the Vehicle Code, 75 Pa. Cons. Stat. Ann. §§ 101 *et seq.* Local governments are authorized to establish procedures governing towing and parking. 75 Pa. Cons. Stat. Ann. § 6109(a); *see also* 75 Pa. Cons. Stat. Ann. § 3353 ("Any city, borough, incorporated town or township may, by ordinance, provide for rates to be charged for removal of vehicles and for municipal regulation of authorized towing services."). The power to administer and enforce parking regulations has been delegated by the City Council to the Philadelphia Parking Authority (the "PPA"). 75 Pa. Cons. Stat. Ann. § 6109(g).

owners the right to "remove or have removed the vehicle at the reasonable expense of the owner of the vehicle." 75 Pa. Cons. Stat. Ann. § 3353(c). A property owner may exercise this right so long as a sign is posted to notify the public of relevant parking restrictions. 75 Pa. Cons. Stat. Ann. § 3353(b)(2).

The City Council has enacted towing ordinances under Section 9-605 of the Philadelphia Code, regulating both consensual and non-consensual tows. Regulations require, among other things, licensing of towing services, approval of fee schedules, proof of insurance, vehicle inspections, and driver background checks. *See* Phila. Code § 9-605 *et seq.*[5] Section 9-605(11)(a) of Philadelphia's towing ordinance also mandates specific signage requirements, ensuring motorists are aware of restrictions before an offending vehicle may be towed. If signage requirements have not been followed, towing of the vehicle is prohibited.[6]

In response to complaints about abusive towing practices, the City Council has experimented with a variety of solutions. In 2010, the City amended its towing ordinance to add a ticketing requirement, largely identical to the ordinance now before this Court. Adding a layer of government approval between the tow truck and the public, the 2010 ordinance required ticketing by the police before an illegally parked vehicle could be towed away at the motorist's expense. Compl. 4-5, ECF No. 1.

The City abandoned the first ticket-to-tow ordinance in 2012 after it proved "unworkable." Compl. 5, ECF No. 1. Instead of a ticketing requirement, new regulations were promulgated that required a towing company to photograph an offending vehicle's license plate, as well as the sign prohibiting parking, and notify the police of any impending tow. *See* Phila.

---

[5]      Section 9-605 of the Philadelphia Code is attached as Ex. A to Defs.' Mot. Dismiss, ECF No. 5. The entire Code can be found at http://library.amlegal.com/nxt/gateway.dll/Pennsylvania/philadelphia_pa/thephiladelphiacode?f=templates$fn=default.htm$3.0$vid=amlegal:philadelphia_pa

[6]      Plaintiffs assert these local requirements are duplicative of state statutory requirements. *See* Pls.' Resp. Mot. Dismiss 7, ECF No. 6.

Code § 9-605(11)(e) (repealed 2017).[7] A vehicle owner was entitled to a copy of these photographs before the owner was required to pay towing and storage fees. *Id*. Failure to comply with these mandates subjected the towing company to monetary penalties and a license suspension. Further, if a vehicle about to be towed had been reported stolen, towing of the vehicle was prohibited for 24 hours to give the owner time to reclaim the vehicle on site. Phila. Code § 9-605(11)(d) (repealed 2017).

This solution, as well, had its detractors. City Council Hr'g Tr. 53:18-55:18, Nov. 29, 2016. Private parking lot owners were unhappy with the 24-hour waiting period for stolen vehicles. When a stolen vehicle was left undisturbed for 24 hours, property owners were unable to use their parking spots, and the stolen vehicle was often vandalized or re-stolen. *Id.* 54:1-15. To combat this, the City began towing all stolen vehicles to a secure lot, and waived fees if an owner reclaimed his or her vehicle within 24 hours. This often left towing companies unpaid for their work. *Id*. at 54:16-55:9. Further, the City reported that it received complaints of no parking signs being posted after a car was parked, and cars being moved from lawful spots to unlawful ones to provide a predicate to tow. *Id*. at 51:11-20.

The City Council again explored amending towing regulations in 2016. On November 29, 2016, a public hearing was held on Bill No. 160682 ("the 2016 ordinance," or "the Ordinance"). The 2016 Ordinance proposed reinstating the ticket-to-tow requirement, but omitting the 24-hour waiting period for stolen vehicles. At the hearing, testimony was given by individual citizens, the Philadelphia Police Department, and a representative from Plaintiff Pennsylvania Apartment Association, East, on behalf of private parking lot owners. The City Council heard complaints about abusive towing practices, as well as complaints about the burden of the 24-hour waiting period and of the long delays, waiting for police to arrive to issue a ticket, that private lot owners

---

[7]          Attached as Ex. D to Defs.' Mot. Dismiss, ECF No. 5.

endured under the prior ticket-to-tow ordinance. A representative of the Police Department testified that a ticketing requirement was necessary to properly determine the legality of disputed tows. *Id.* at 57:14-24.

Bill No. 160682, amending Section 9-605 of the Philadelphia Code, was passed by the City Council on December 8, 2016 and signed by Mayor James Kenney on January 24, 2017. The law went into effect on February 1, 2017. Balancing the competing interests involved, the final amended Ordinance resurrects the ticketing requirement to ensure that a neutral law enforcement authority first certifies that a vehicle is unlawfully parked before it may be towed. But to minimize delays in waiting for a ticket, the Ordinance expands the entities eligible to determine if a car is illegally parked. Rather than requiring a ticket from the Philadelphia Police Department, the Ordinance allows "other law enforcement authorities," to issue tickets, which includes the Parking Authority, SEPTA, and various university-affiliated police forces. Phila. Code § 9-605(d); City Council Hr'g Tr. 56:13-20; 90:17-91:24, Nov. 29, 2016. The 24-hour waiting period for stolen vehicles was removed entirely.

 The Property Management Group, Ltd., B.H. Holding Corp., Core Asset Management, LLC, Pennsylvania Apartment Association, East, Gabriel Falco and Elba Gonzalez ("Property Owners"), Abob's Towing, Inc., Siani's Towing and Recovery, LLC, Lewis Blum Towing, Inc., ("Towing Companies," collectively, "Plaintiffs") now bring suit in this Court against the City of Philadelphia ("the City")[8], seeking to invalidate the Ordinance. Plaintiffs' Complaint, ECF No.

---

[8] The Complaint also names as Defendants Jim Kenney, in his official capacity as Mayor of the City of Philadelphia, Richard Ross, Jr. in his official capacity as Police Commissioner, and the Philadelphia Police Department. Plaintiffs' claims however, lie only against the City itself. Claims against City officials named in their official capacity are indistinguishable from claims against the City. *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (*quoting Monell v. N.Y.C. Dept. of Soc. Servs.,* 436 U.S. 658, 690, n. 55 (1978)). "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* Also, the Police Department is not an independent legal entity and therefore not amenable to suit. Suits against the Police Department must be made in the name of the City of Philadelphia. *Gremo v. Karlin*,  363 F. Supp. 2d 771, 780 (E.D.

1, makes three primary claims in two counts. In Count I, Property Owners and Towing Companies claim the Ordinance was impermissibly enacted and is preempted by state law. They seek an order under the Declaratory Judgments Act, 42 Pa. Cons. Stat. Ann. § 7532, declaring that the Ordinance is void because the City Council exceeded its power under Article IX, Section 2 of the Pennsylvania Constitution and §§ 13131 and 13133 of the Home Rule Act. They also seek an order that the Ordinance is void because it is preempted by the state Vehicle Code, 75 Pa. Cons. Stat.  Ann. §§ 3351-3354. In Count II, Property Owners claim the Ordinance is unconstitutional.[9] They claim the Ordinance operates as an unlawful taking without just compensation, in violation of Art. I, Sec. I of the Pennsylvania Constitution and the Fifth and Fourteenth Amendments of the United States Constitution. The Property Owners also claim the Ordinance violates their procedural due process rights because the Ordinance impinges upon their property interests without a requisite post-deprivation hearing.[10]

On February 15, 2017, Property Owners filed suit in the Court of Common Pleas, seeking to enjoin the Ordinance. They amended their complaint on March 21, 2017, and it was timely removed by the City. ECF No. 1. On March 28, 2017, the City moved to dismiss the Complaint in its entirety for failure to state a claim upon which relief can be granted. ECF No. 5. I exercise jurisdiction over this dispute pursuant to federal question jurisdiction 28 U.S.C. § 1331, and supplemental jurisdiction, 28 U.S.C. § 1367.

---

Pa. 2005); *see also* 53 Pa. Stat. Ann. § 16257. Counsel for both sides agreed on this point at the May 3, 2017 motion hearing. Mot. Hr'g Tr. 3:25  May 3, 2017.

[9]     Counsel stipulated on the record at the May 3, 2017 motion hearing that only the Property Owners were asserting constitutional claims, and that the Towing Companies were not.  Mot. Hr'g Tr. 7:12-22,  May 3, 2017.

[10]     The Complaint contains a third count, asking for an injunction, but substantively Count III is duplicative of the other counts.

## II.   DISCUSSION

In deciding a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks omitted).

To survive dismissal, a complaint must allege facts sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In order to determine the sufficiency of a complaint under *Twombly* and *Iqbal*, a court must engage in the following analysis:

> First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013), *as amended* (May 10, 2013) (quoting *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011).

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. However, an exception to the general rule is that a 'document *integral to or explicitly relied* upon in the complaint' may be considered . . . ." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citations omitted). Thus, a court may consider "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon

these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

Further, a facial challenge to a legislative or municipal act is "the most difficult challenge to mount successfully." *United States v. Salerno*, 481 U.S. 739, 745 (1987). To deem the statute facially invalid, the challenger must establish "that no set of circumstances exists under which [the statute] would be valid . . . or that the statue lacks any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010). Courts are generally to defer to the judgment of the legislature, and "do not sit as a super-legislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare." *Day-Brite Lighting Inc. v. State of Missouri*, 342 U.S. 421, 423 (1952).[11]

## A. COUNT I - PREEMPTION

In Count I of their Complaint, Property Owners and Towing Companies make several overlapping arguments. First, they claim that enactment of the Ordinance runs afoul of the City Council's powers under Article IX, Section 2 of the Pennsylvania Constitution and § 13133(a) of the Home Rule Act. Specifically, they allege the Ordinance was erroneously enacted because "it involves the regulation of parking, which is not an inherently municipal function." Pls.' Resp. Mot. Dismiss 29, ECF No. 6. Second, they argue that the Ordinance is violative of § 13133(b) of the Home Rule Act because the Ordinance is preempted by Vehicle Code § 3353(c). Finally, they make out a standard conflict preemption claim, arguing directly that the Ordinance conflicts with Vehicle Code § 3353(c) and is therefore preempted.[12] The City moves to dismiss Count I of

---

[11]    Although regulatory taking claims require a fact-sensitive analysis, courts often do dismiss such matters at the motion to dismiss stage, without making factual findings. *See Newark Cab Ass'n v. City of Newark*, No. CV164681WHWCLW, 2017 WL 214075, at *5 (D.N.J. Jan. 18, 2017).

[12]    Because Plaintiffs' second claim, that the Ordinance violates § 13133(b) of the Home Rule Act, is merely another way of stating a preemption claim, those two arguments are considered together. *Nutter v. Dougherty*, 595 Pa. 340, 357 (2007) ("[F]undamental principles of preemption also apply to the courts consideration of whether a given municipal exercise of power is in fact limited by an act of the General Assembly."). Plaintiffs' counsel advised at oral argument that the two arguments are corollaries of one another. Tr. Hr'g 24:7-11. May 3, 2017.

the Complaint because, they argue, the Ordinance is a valid exercise of the City's municipal power as a towing regulation.

1.  Enactment under the Home Rule Act, § 13133(a) – Municipal Functions

"[I]t is fundamental that municipalities are creatures of the state and that the authority of the Legislature over their powers is supreme." *Naylor v. Township of Hellam*, 565 Pa. 397, 403 (2001) (citations omitted). The City's "ability to exercise municipal functions is limited only by its home rule charter, the Pennsylvania Constitution, and the General Assembly." *City of Philadelphia v. Schweiker*, 579 Pa. 591, 605 (2004).[13] "[I]n analyzing a home rule municipality's exercise of power . . . [courts] begin with the view that it is valid absent a limitation found in the Constitution, the acts of the General Assembly, or the charter itself, and [courts] resolve ambiguities in favor of the municipality." *Nutter v. Dougherty*, 595 Pa. 340, 357 (2007) (citations omitted). *See also* 53 Pa. Cons. Stat. Ann. § 2961 ("All grants of municipal power to municipalities governed by a home rule charter under this subchapter . . . shall be liberally construed in favor of the municipality.").

The City of Philadelphia exists as a first class city under the Home Rule Act, 53 Pa. Stat. Ann. § 13131 *et seq. See also* 351 Pa. Code §§ 1.1-100-12.12-503 (Philadelphia's Home Rule Charter). The Home Rule Act is an enabling statute that "grants to first class cities that adopt a home rule charter, *i.e.,* Philadelphia, 'complete powers of legislation and administration in relation to its municipal functions.'" *City of Philadelphia v. Rendell*, 888 A.2d 922, 929 (Pa. Commw. Ct. 2005) (quoting 53 Pa. Stat. Ann. § 13131). Section 13133(a) of the Home Rule Act

---

[13]     The structural limits on municipal power are enshrined in both the Pennsylvania Constitution and state statute, by way of the Home Rule Charter itself. *See* Pa. Const. Art. IX § 2 ("A municipality which has a home rule charter may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time."); *see also* 53 Pa. Stat. Ann. § 13131 ("The charter of any city adopted or amended in accordance with this act may provide for a form or system of municipal government and for the exercise of any and all powers relating to its municipal functions, not inconsistent with the Constitution of the United States or of this Commonwealth, to the full extent that the General Assembly may legislate in reference thereto . . . .")

places limits on a municipality's powers by "identify[ing] those activities that do not constitute

home rule municipal functions." *Id.* Section 13133(b) of the Home Rule Act dictates that "no

city shall exercise powers contrary to, or in limitation or enlargement of, powers granted by acts

of the General Assembly which are . . . applicable in every part of the Commonwealth." 53 Pa.

Stat. Ann. § 13133(b). A municipal ordinance can therefore be violative of § 13133(a) of the

Home Rule Act, by regulating in an impermissible area, or of § 13133(b) of the Act, by

regulating inconsistently with state statute.

      As identified, there are three external limits to the City's municipal power: the

Constitution, the Home Rule Charter, and state statute. Plaintiffs point to no internal provisions

of the Pennsylvania Constitution that deem the Ordinance outside the bounds of the City's

municipal power. They also fail in arguing that § 13133(a) of the Home Rule Act limits the

City's ability to legislate in the area of parking or towing. While it is true that parking is not an

inherently municipal function, that does not mean the City cannot regulate in that area. *City of

Philadelphia v. Rendell*, 888 A.2d at 929 n. 18 ("There is no authority for the City's premise that

parking is an inherently municipal function."). This merely means that a municipality may not

point to the Home Rule Act as its source of authority to regulate parking, but must derive the

power to regulate parking from another statutory source. "[T]he Parking Authority Law, a non-

home rule enactment, is the source of the [parking regulation] power, 53 Pa. C.S. § 5504(a), and

the source of the City's power to delegate parking functions to the [parking authority], 53 Pa.

C.S. § 5505(a)." *Id.* (citing *Schweiker*, 579 Pa. at 610).[14] Although parking is not an inherently

municipal function, neither 'parking' nor 'towing' is expressly listed as an activity "that [does

not] constitute home rule municipal functions" in Section 13133(a) of the Home Rule Act. *City*

---

[14]    Plaintiffs assert the City may not regulate towing as a function of its Home Rule Act powers, but they do
not challenge the City's ability to regulate parking or towing as a matter of other state statutes. Since the City's
authority to regulate in this area pursuant to other statutory sources is not questioned, I will not address it.

*of Philadelphia v. Rendell*, 888 A.2d at 929.[15] Property Owners and Towing Companies therefore fail in claiming that the Ordinance violates § 13133(a) of the Home Rule Act by regulating a non-municipal function.

2. Preemption Claims under the Home Rule Act, § 13133(b)[16]

The Property Owners and Towing Companies hitch their remaining allegations in Count I to the third external constraint on municipal power, arguing the Ordinance is preempted by state statute. "Preemption takes three forms . . . express, conflict, and field preemption." *Nutter v. Dougherty*, 595 Pa. at 357. "Total preemption is the exception and not the rule." *Council of Middletown Township v. Benham*, 514 Pa. 176, 184 (1987). Plaintiffs make no claim of field, or total, preemption. Instead they assert that the Ordinance is expressly preempted by § 6101(a) of the Vehicle Code. They also argue that conflict preemption applies, and that the Ordinance fails because it conflicts with § 3353(c) of the same Vehicle Code. The City asserts that the Vehicle Code "indicates no intent to preempt local action . . . ." Defs.' Mot. Dismiss 11, ECF No. 5.

a. Express preemption

For a state statute to expressly preempt local action, the General Assembly must "expressly signal[] its preemptive intent" in the relevant statute. *Nutter*, 595 Pa. at 357. Express

---

[15]     The City is also clearly permitted to regulate towing, which is what the Ordinance does. The Ordinance exists in the section of the Philadelphia Code entitled "Towing." Section 3353(c) of the Vehicle Code, the very statutory provision Plaintiffs argue preempts the Ordinance, contemplates that a municipality may regulate towing services. *See* 75 Pa. Cons. Stat. Ann § 3353(c) ("Any city . . . may, by ordinance, provide for . . . municipal regulation of authorized towing services.").

[16]     As explained in note 9, *supra*, Plaintiffs' preemption argument and their second Home Rule Act argument, under § 13133(b), are one in the same. They argue that the Ordinance "restricts the statutory power granted by the General Assembly under 75 Pa. Cons. Stat. Ann. § 3353(c)" and therefore it violates Section 13133(b) of the Home Rule Act by limiting a power granted by state statute that is "applicable in every part of the Commonwealth." Pls.' Resp. Mot. Dismiss 31, ECF No. 6. Accordingly, they argue, "the ticketing requirement is void because the City does not have the statutory power to modify the Vehicle Code's uniform statewide regulatory scheme governing parking. . . ." *Id*. This is in essence a run-of-the-mill preemption argument, because "any enactment pursuant to [the Home Rule Act's] authority is subject to the doctrine of preemption . . . fundamental principles of preemption also apply to the courts consideration of whether a given municipal exercise of power is in fact limited by an act of the General Assembly." *Nutter v. Dougherty*, 595 Pa. 340, 357 (2007). Plaintiffs' counsel advised as much at oral argument. Plaintiffs' counsel advised at oral argument that the two arguments are corollaries of one another. Tr. Hr'g 24:7-11. May 3, 2017.

preemption requires a "clear statement of legislative intent to preempt" and absent such a statement, "state legislation will not generally preempt local legislation on the same issue." *Mars Emergency Med. Servs., Inc. v. Township of Adams*, 559 Pa. 309, 315 (1999).

The Property Owners and Towing Companies point to § 6101(a) of the Vehicle Code as "express" intent to preempt. That provision reads: "no local authority shall enact or enforce any ordinance on a matter covered by the provisions of this title unless expressly authorized." 75 Pa. Cons. Stat. Ann. § 6101(a). Although dubious whether or not this provision qualifies as a clear statement of legislative intent to preempt all local ordinances on the subject, such an inquiry is of no moment.[17] Merely because the General Assembly requires express statutory authorization for local regulation does not mean the legislature has decreed that municipalities many not regulate in the area. *See Benham*, 514 Pa. at 180 ("The state is not presumed to have preempted a field merely by legislating in it."). Furthermore, the Vehicle Code does in fact "expressly authorize" towing regulation. Section 3353(c) of the Vehicle Code, the very provision Property Owners and Towing Companies claim conflicts with the Ordinance, see *infra*, states that "[a]ny city . . . may, by ordinance, provide . . . for municipal regulation of authorized towing services." 75 Pa. Cons. Stat. Ann. § 3353(c). The Property Owners and Towing Companies concede as much in their brief. Pls.' Resp. Mot. Dismiss 34, ECF No. 6. ("The statute contains express authorization for municipal regulation of towing services . . . ."). The express preemption claim fails.

---

[17]    Prior cases finding express preemption to completely occupy a field of regulation concerned statutes with stronger language. Express preemption has been found when "the legislation in question expressly stated the legislature's intent that its enactments provide the *exclusive source* of regulatory law in these areas." *Nutter v. Dougherty*, 595 Pa. at 362 (emphasis added). Express preemption of local strip mining regulation was found when the General Assembly passed a statute that said "[a]ll coal stripping operations coming within the provisions of this act shall be within the exclusive jurisdiction of the department and shall be conducted in compliance with such reasonable rules and regulations as may be deemed necessary by the secretary." 52 P.S. § 681.20c. *See also Mars Emergency Med. Servs., Inc.*, 559 Pa. at 318 (1999).  Similarly, express preemption of local liquor laws was found in the Liquor Code, which states that the  purpose of the code is to "prohibit the manufacture of and transactions in liquor, alcohol and malt or brewed beverages which take place in this Commonwealth, except by and under the control of the board as herein specifically provided, and every section and provision of the act shall be construed accordingly." 47 P.S. § 1-104. *See id.*

b. <u>Conflict Preemption</u>

Absent an explicit intention to preempt local laws, Property Owners and Towing Companies assert that conflict preemption applies because the Ordinance nonetheless conflicts with the right of a property owner under § 3353(c) to eject a vehicle. The City responds that the Ordinance does not conflict with § 3353(c) because the rights bestowed by the statute remain unaffected by the Ordinance—under the Ordinance, owners "continue to be able to remove unauthorized vehicles from their private lots at the vehicle owner's expense." Defs.' Mot. Dismiss 11, ECF No. 5. They merely have to wait for a ticket to do so. The City contends that although the statute grants the owners a right to remove vehicles, this right is not an "absolute, unfettered right to use licensed towing companies within the City of Philadelphia to immediately eject any vehicle." Defs.' Mot. Dismiss 12, ECF No. 5.

Finding conflict preemption between a state and local law is onerous. "For conflict preemption to be applicable, the conflict between the statute and the ordinance must be irreconcilable." *Holt's Cigar Co. v. City of Phila.*, 608 Pa. 146, 154 (2011). A statute and an ordinance are irreconcilable "when simultaneous compliance with both the local ordinance and the state statute is impossible." *Hoffman Min. Co. v. Zoning Hearing Bd.*, 612 Pa. 598, 610 (2011). In the absence of such incompatibility, "the will of the municipality as expressed through an ordinance will be respected . . . ." *City Council v. Marcincin*, 512 Pa. 1, 13 (1986).

Section 3353(c) of the Vehicle Code, as explained above, grants private property owners the right to remove illegally parked vehicles. The statue reads in relevant part:

> **(c) Property owner may remove vehicle.--**The owner or other person in charge or possession of any property on which a vehicle is parked or left unattended in violation of the provisions of subsection (b) may remove or have removed the vehicle at the reasonable expense of the owner of the vehicle. Such person who removes or has removed a vehicle left parked or unattended in violation of the provisions of subsection (b) shall have a lien against the owner of the vehicle, in the amount of the reasonable

value of the costs of removing the vehicle plus the costs of storage. Any city, borough, incorporated town or township may, by ordinance, provide for rates to be charged for removal of vehicles and for municipal regulation of authorized towing services. If storage charges are not set by the municipality, a maximum of $25 per day may be charged for storage.

75 Pa. Cons. Stat. Ann. § 3353.

The rights afforded under § 3353(c) are not irreconcilable with the Ordinance. Section 3353(c) merely allows landowners to "remove or have removed the vehicle at the reasonable expense of the owner of the vehicle." A ticket-to-tow ordinance conditions that right upon government action (granting a ticket to the illegal parked vehicle) but does not destroy the right entirely. Simultaneous compliance with the statute and the ordinance is not impossible, because, as the City correctly points out, the right granted by § 3353(c) is not "unfettered." Municipal regulation already places limitations on a property owners' right to seek removal of a vehicle. Phila. Code. § 9-605 *et seq*. The conflict preemption claim is a non-starter.

## B. REGULATORY TAKING

In Count II of their Complaint, Property Owners allege that the Ordinance operates as a taking of their property without just compensation, in violation of the Fifth Amendment.[18] Property Owners asserted at oral argument they are only making a regulatory takings claim. Mot. Hr'g Tr. 25:21-23, May 3, 2017. The City moves to dismiss Count II because, they argue, the Ordinance does not deprive Property Owners of their property and therefore no compensation is warranted.

The Property Owners mount a facial challenge to the Ordinance, asserting that it is void in its entirety because it constitutes a *per se* regulatory taking by way of physical invasion. In the

---

[18] "It is well-recognized that this prohibition applies to state and local governments under the Fourteenth Amendment." *Cowell v. Palmer Township*, 263 F.3d 286, 290 (3d Cir. 2001) (citing *Chicago, Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226, 239 (1897)).

alternative, Property Owners argue that the Ordinance is a regulatory taking under the ad-hoc balancing test identified in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). A regulatory taking occurs when "government regulation of private property [is] . . . so onerous that its effect is tantamount to a direct appropriation or ouster . . . ." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). A *per se* regulatory taking occurs when regulation requires an owner to suffer a permanent physical invasion of his or her property, or where the regulation deprives an owner of all economically beneficial uses of his or her property. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1012 (1992).[19] Facial challenges to statues under the Takings Clause, much like all facial challenges, face an "uphill battle." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 495 (1987). The challenger must show that "mere enactment" of a piece of legislation constituted a taking. *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 736 n. 10 (1997) (citations omitted).

 The Property Owners claim that because the Ordinance limits a property owner's immediate right to exclude others (at least until a ticket has issued), the government has granted "what amounts to a permanent easement, which allows members of the public to use their private parking spaces on a continuous and permanent basis as free short term parking lots." Pls.' Resp. Mot. Dismiss 43, ECF No. 6. Although the government regulation has quite obviously not permanently deprived the Property Owners of their property, they argue that a "permanent" invasion has taken place because Property Owners are never able to eject trespassing cars immediately. Therefore, they allege, the infringement on their right to exclude is omnipresent, constant and permanent.

 Takings claims asserted under the Fifth Amendment are subject to unique ripeness

---

[19]   The Property Owners do not argue, in their briefs or at oral argument, that the Ordinance deprives them of all economically beneficial uses of their property, and so that theory is not addressed.

requirements.[20] As identified in *Williamson County Regional Planning Commission v. Hamilton Bank,* 473 U.S. 172 (1985), and made evident by a plain reading of the constitutional provision, the Fifth Amendment does not prohibit all takings, regulatory or otherwise. It only proscribes takings without just compensation. In order to mount a successful takings claim, a plaintiff must first seek out just compensation from the government to ensure that a constitutional violation has occurred in the first place. *Cowell v. Palmer Township*, 263 F.3d 286, 290 (3d Cir. 2001).

The Supreme Court held in *Williamson County* that an as-applied Fifth Amendment takings claim is not ripe until "(1) 'the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue' (the 'finality rule'), and (2) the plaintiff has unsuccessfully exhausted the state's procedures for seeking 'just compensation.'" *Cty. Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 164 (3d Cir. 2006) (quoting *Williamson Cty.*, 473 U.S. at 186). The finality rule "does not apply . . . to *facial* attacks . . . i.e., a claim that the mere enactment of a regulation [] constitutes a taking without just compensation." *Id.* The exhaustion requirement, however, does apply to facial challenges. As the Third Circuit ruled:

> While the fact that [Plaintiffs] allege a *facial* Just Compensation Takings claim against the Ordinance may save them from the finality rule, it does not relieve them from the duty to seek just compensation from the state before claiming that their right to just compensation under the Fifth Amendment has been violated.

*Id.* at 168.

"The Fifth Amendment [does not] require that just compensation be paid in advance of, or contemporaneously with, the taking; all that is required is that a reasonable, certain and

---

[20]     Neither party has questioned whether or not the takings claim is ripe, but "considerations of ripeness are sufficiently important that [courts] are required to raise the issue *sua sponte* even though the parties do not." *Felmeister v. Office of Attorney Ethics*, 856 F.2d 529, 535 (3d Cir.1988); *see also Cty. Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 163–64 (3d Cir. 2006).

adequate provision for obtaining compensation exist at the time of the taking." *Williamson Cty.,*
473 U.S. at 194 (quotations omitted). If a "reasonable, certain and adequate provision for
obtaining compensation" exists in Pennsylvania, and Property Owners have failed to avail
themselves of that procedure, then Count II of their Complaint must be dismissed, without
prejudice, as unripe.

Pennsylvania provides an adequate procedure. "Pennsylvania's Eminent Domain Code
provides inverse condemnation procedures through which a landowner may seek just
compensation for the taking of property." *Cowell*, 263 F.3d at 290. *See* 26 Pa. Cons. Stat. Ann.
§§ 1-408, 1-502(e), 1-609; *Knick v. Township*, No. 3:14-CV-02223, 2016 WL 4701549, at *6
(M.D. Pa. Sept. 8, 2016). The Code "provides a complete and exclusive procedure and law to
govern all condemnations of property for public purposes and the assessment of damages." 26
Pa. Cons. Stat. Ann. § 102. Any "owner of a property interest taken, injured or destroyed," 26
Pa. Cons. Stat. Ann. § 103, "may file a petition requesting the appointment of viewers to declare
a taking and ascertain just compensation." *Cowell*, 263 F.3d at 290 n. 2 (citing 26 Pa. Cons. Stat.
Ann. § 1-502(e)).

Courts in Pennsylvania routinely dismiss takings claims as unripe when a plaintiff has
failed to exhaust available remedies under the Eminent Domain Code. *See Cty. Concrete Corp.*,
442 F.3d at 168 (facial challenge to zoning ordinance limiting plaintiffs gravel removal
operations unripe); *Cowell*, 263 F.3d at 286 (challenge to imposition of municipal liens unripe);
*Knick*, 2016 WL 4701549, at *6 (facial challenge to ordinance deeming plaintiffs' property
accessible to public as an ancient burial ground unripe). *See also Gould v. Council of Bristol
Borough*, No. CIV.A. 13-4016, 2014 WL 296944, at *7 (E.D. Pa. Jan. 27, 2014), *aff'd sub nom.
Gould v. Borough*, 615 F. App'x 112 (3d Cir. 2015); *Tripodi v. North Coventry Township*, No.

CIV.A. 12-4156, 2013 WL 4034372, at *9 (E.D. Pa. Aug. 8, 2013), *aff'd*, 616 F. App'x 521 (3d Cir. 2015).

This Court ordered briefing on this issue and briefs were submitted on May 18, 2017. The Property Owners assert that they have not made use of the Eminent Domain procedure, but that they are unable to avail themselves of it because "the taking in this case is not a valid exercise of the City's eminent domain powers and therefore falls outside the scope of the Eminent Domain code and no other remedy exists." Pls.' Supp. Br. 5, ECF No. 18. They claim that because the taking alleged benefits *private* vehicle owners, the Ordinance was not enacted for a *public* purpose, and is therefore not a "condemnation" within the meaning of the Act.

This argument is a dead end. Merely because the vehicle owners who benefit from the Ordinance are private individuals does not mean that the Ordinance was not enacted for a public purpose. Individual motorists are quite obviously members of the public, just as all beneficiaries of a public easement are themselves private individuals. That a benefit inures to private individuals, collectively, does not diminish the public nature of the alleged taking. *See Kelo v. City of New London*, 545 U.S. 469, 482 (2005) ("[We] rejected the contention that the mere fact that the State immediately transferred the properties to private individuals upon condemnation somehow diminished the public character of the taking. '[I]t is only the taking's purpose, and not its mechanics,' . . . that matters in determining public use.") (citing *Haw. Hous. Auth. v. Midkiff,* 467 U.S. 229, 244 (1984)). The City Council has determined that a legislative balance that slightly favors private vehicle owners over private landowners serves "the general welfare and public interests of the community," Phila. Code § 9-605(1), and therefore the Ordinance serves a public purpose.

In any event, Property Owners' ability to make use of the Eminent Domain code has no

relation to whether or not the Ordinance was a proper exercise of the City's eminent domain

powers. The Third Circuit rejected this precise argument in *Cowell*, 263 F.3d at 286. In *Cowell*,

in a challenge to municipal liens on individual properties, plaintiffs argued they could not make

use of the Eminent Domain Code because "the Township did not have legal authority under the

Eminent Domain Code or any other power to impose the liens." 263 F.3d at 291. The court ruled

that "[t]he plaintiffs' ability to file an inverse condemnation petition [under the Eminent Domain

Code] in order to obtain just compensation was not related to the Township's right to impose the

liens." *Id*.

Pennsylvania's Eminent Domain Code provides procedures through which Property

Owners may seek just compensation for the taking of property. Since they have failed to seek

compensation, their takings claim fails for lack of ripeness.[21]

## C. PROCEDURAL DUE PROCESS

Imbedded in their Complaint, but prominently argued in their brief, Property Owners also

claim that the Ordinance constitutes a violation of procedural due process. They argue the

Ordinance deprives them of due process because it "provides no recourse to private property

---

[21]    Even if the Property Owners' claims were ripe, they have no merit. It is indeed the case that the Supreme
Court has held that a government regulation limiting a private property owner's right to exclude can amount to a
taking, and that "even if the Government physically invades only an easement in property, it must nonetheless pay
just compensation." *Kaiser Aetna v. United States*, 444 U.S. 164, 179 (1979); *accord Nollan v. Cal. Coastal
Comm'n*, 483 U.S. 825, 841 (1987). But the Ordinance before me does not grant an easement. Although the
Ordinance may generate a brief delay in Plaintiffs' right to eject trespassers, the ticket requirement does not
"constitute an authorization or endorsement of the offending vehicle's trespass." Defs.' Reply Mot. Dismiss 7, ECF
No. 9. Trespassing vehicles are never affirmatively permitted to park illegally, even while waiting for a ticketing
agent to arrive. There is therefore no *per se* regulatory taking because there has been no permanent physical
invasion, and certainly the Ordinance has not "deprive[d] [Plaintiffs] of all economically viable use of [their]
property." *Cowell*, 263 F.3d at 291.
    The Ordinance also does not function as a taking under the balancing test of *Penn Central Transportation
Co. v. City of New York*, 438 U.S. 104 (1978). A taking is not found when the "interference arises from some public
program adjusting the benefits and burdens of economic life to promote the common good." 438 U.S. at 124. As the
Supreme Court reasoned in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922), the "[g]overnment hardly
could go on if to some extent values incident to property could not be diminished without paying for every such
change in the general law." Further, "government regulation – by definition – involves the adjustment of rights for
the public good. Often this adjustment curtails some potential for the use or economic exploitation of private
property. To require compensation in all such circumstances would effectively compel the government to regulate
by purchase." *Andrus v. Allard*, 444 U.S. 51, 65 (1979).

owners when police frail to respond in a timely manner, fail to respond at all, or refuse to issue a ticket." Pls.' Resp. Mot. Dismiss 15, ECF No. 6. The City decries the procedural due process violation as based upon a "false premise" because there is no reason to conclude that police officers will refuse to ticket a vehicle parked illegally or that any delay in their arrival would be unreasonable. Defs.' Mot. Dismiss 20, ECF No. 6.

In order to establish a procedural due process claim, a plaintiff must establish that "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)); *see also Midnight Sessions, Ltd., v. City of Phila.*, 945 F.2d 667, 680 (3d Cir. 1991); *rev'd on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington, PA*, 316 F.3d 392 (3d Cir. 2003). Therefore, to state a proper claim, a plaintiff must possess a property interest that is interfered with, and the process afforded to him must be inadequate. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454 (1989).

1. Property Interest

To be eligible to state a procedural due process violation, "the City must have infringed a property interest encompassed by the Fourteenth Amendment." *Midnight Sessions,* 945 F.2d at 679. Property interests that invoke procedural due process are defined "somewhat differently than they are for taking purposes," *id.*, but such interests "may take many forms." *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 576 (1972). "Although the underlying substantive interest is created by 'an independent source such as state law,' federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978) (quoting *Roth*,

408 U.S at 577). In deciding whether an interest requires due process protection, "the question is not merely the weight of the individual's interest"—namely, the grievousness of the deprivation as experienced by the claimant—"but whether the nature of the interest is one within contemplation" of the Fourteenth Amendment. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

The Supreme Court has recognized a wide variety of property interests that trigger procedural due process protections. *See Memphis Light*, 436 U.S. at 9 (utility services); *Goss v. Lopez*, 419 U.S. 565, 576 (1975) (public education); *Goldberg v. Kelly*, 397 U.S. 254, 255 (1970) (welfare benefits); *see also Ingraham v. Wright*, 430 U.S. 651, 672 (1977) (liberty interest invoked by corporal punishment policy at a public school); *Morrissey*, 408 U.S. at 482 (parole revocation). Nonetheless, "the range of interests protected by procedural due process is not infinite." *Ingraham*, 430 U.S at 672 (quoting *Roth*, 408 U.S at 570).

In *Ingraham v. Wright*, the Supreme Court found due process was triggered by the corporal punishment policies of a public school. 430 U.S. at 683. Even though there may be "a *de minimis* level of imposition with which the Constitution is not concerned," the nature of interest at stake—a student's freedom from bodily restraint and punishment—invoked procedural due process protection. *Id.* at 674. Similarly, in *Goss v. Lopez*, the Court found that procedural due process was triggered by temporary public school suspensions. 419 U.S. at 576. The character of the interest infringed upon—the ability to attend public school—required due process even though the length of the deprivation was temporary. *Id.* "The length and consequent severity of a deprivation, while another factor to weigh in determining the appropriate form of [process], is not decisive of the basic right" to process at all. *Id.* (quotations omitted). "[A]s long as a property deprivation is not *de minimis*, its gravity is irrelevant to the question whether account must be taken of the Due Process Clause." *Id.*

The Ordinance implicates procedural due process because, construing the Complaint in the light most favorable to Property Owners, the Ordinance functions as an infringement on a possessory interest in land. The Ordinance imposes as a brief limitation on the Plaintiff Property Owners' ability to immediately eject trespassers from their land by requiring state action first. The Supreme Court has recognized that "one of the essential sticks in the bundle of property rights is the right to exclude others." *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 82 (1980); *see also Kaiser Aetna v. United States*, 444 U.S. 164, 179–180 (1979).[22] Pennsylvania law clearly recognizes that "[a]mong the critical characteristics of [property] ownership is the right to exclude others from the premises in question." *Commonwealth v. Gordon*, 546 Pa. 65, 75 (1996). "The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 435 (1982). *See also* Restatement (First) Property § 7 (1936).

Physical land is an interest that undoubtedly implicates the Fourteenth Amendment, and albeit slight, the Ordinance implicates that interest. While the 'weight' of this deprivation is to be analyzed in determining the amount of process due, only the nature of the property right in question is relevant in determining if process is due at all. *Goss*, 419 U.S. at 576. The fact that the deprivation of the property interest is fleeting is not determinative of this initial threshold question. Therefore I find that the Ordinance triggers procedural due process protections.

2. Procedural Protections

"Once it is determined that due process applies, the question remains what process is due." *Goss*, 419 U.S. at 577 (quotations omitted). Ordinarily, the requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v.*

---

[22]     These are takings cases, but the analysis of property rights is illustrative.

*Eldridge,* 424 U.S. 319, 334 (1976).[23] But "due process is flexible." *Morrissey*, 408 U.S. at 481.

When determining the required procedural minima, courts must consider the private interest at

stake, the risk of erroneous deprivation, the probable value of additional safeguards, and the

government's interest in efficiency. *Id.* The Supreme Court has recognized that:

> [O]n occasion . . . where the potential length or severity of the deprivation does not
> indicate a likelihood of serious loss and where the procedures underlying the decision to
> act are sufficiently reliable to minimize the risk of erroneous determination, [the]
> government may act without providing additional 'advance procedural safeguards.'

*Memphis Light*, 436 U.S. at 19 (quoting *Ingraham*, 430 U.S. at 680). In fashioning appropriate

procedural safeguards, courts also look to "the length and consequent severity of a deprivation,"

*Goss*, 419 U.S. at 576, and must ensure "appropriate accommodation of the competing interests

involved." *Id*. at 579. Ultimately, due process is elastic and the procedural protections it requires

vary according to what the particular situation demands. *Morrissey*, 408 U.S. at 481. The

application of the Due Process clause is an "intensely practical matter[]." *Goss*, 419 U.S. at 578.

Property Owners claim the private interest at stake is "treasured," and the risk of

erroneous deprivation is high because:

> It is highly unlikely . . . that a property owner would make a report that would not justify
> the issuance of a ticket. Thus, delaying a property owner's right to remove a trespassing
> vehicle so that police can confirm what the property owner has already determined, will
> almost always be in error.

Pls.' Resp. Mot. Dismiss 25, ECF No. 6. They further assert there is a high value to affording

property owners a post-deprivation remedy when police fail to respond, or when the wait for

police to arrive is several hours.

Property Owners correctly point out that the private interest at stake, the ability to

immediately eject trespassers, is a vital aspect of private landownership. But ultimately, the

---

[23]     A hallmark of procedural due process is a pre-deprivation hearing. However, as Property Owners
acknowledge, Pls.' Resp. Mot. Dismiss 24, a pre-deprivation hearing makes little sense in this factual context. ECF
No. 6.They only claim the Ordinance's lack of a post-deprivation hearing violates due process.

procedures afforded by the Ordinance do not fall below the requirements of due process. Initially, the risk of erroneous deprivation is low. In this context, an erroneous deprivation would only occur if a police officer refused to issue a ticket to an offending vehicle. Despite Property Owners' allegations, a mere delay in the arrival of police is not an "erroneous" deprivation— "delay alone does not create a procedural due process violation." *Midnight Sessions*, 945 F.2d at 682. And the Ordinance, as amended in its current iteration, expands the agencies authorized to issue tickets precisely to reduce delays in enforcement.

Furthermore, Property Owners provide no reason to believe why a police officer would refuse to issue a ticket when one is clearly warranted, and as the City points out, nothing in the statute prevents a property owner from calling another police officer, or any of the other agencies authorized to grant tickets, if he or she feels a ticket has been denied in error. In any event, private citizens do not have a due process right to enforcement by police. *Burella v. City of Philadelphia*, 501 F.3d 134, 146 (3d Cir. 2007) (domestic violence victim "does not have a cognizable claim that the officers' failure to enforce the orders of protection violated her due process rights.").

Also, Property Owners do not show the probable value of advanced procedural safeguards. It is unclear how a post-deprivation hearing, presumably in which private property owners could contest an erroneous ticket determination, would allay any of Property Owners' concerns. A retroactive determination that a police officer should have granted a ticket to an offending vehicle would do nothing to reestablish an erroneously deprived property right— unlike the government benefits at stake in *Mathews* or *Goldberg,* a property owner cannot have his or her immediate right to exclude trespassers restored. By the time any post-deprivation hearing were to occur, the trespassing vehicle would likely be gone anyway.

Moreover, the Ordinance does not disturb common law remedies available to private property owners. "[W]here the State has preserved what 'has always been the law of the land,' the case for administrative safeguards is significantly less compelling." *Ingraham*, 430 U.S. at 679 (quoting *United States v. Barnett*, 376 U.S. 681 (1964)). In *Ingraham*, although the Court ruled that a Florida public school's corporal punishment procedure implicated a right protected by the Due Process Clause, the Court found that the "Fourteenth Amendment's requirement of procedural due process [was] satisfied by Florida's preservation of common-law constraints and remedies." *Id.* at 683. When there is "every reason to believe" that grievous deprivation of student's rights would be "an aberration," due process requires nothing more than resort to traditional civil or criminal penalties. *Id.* at 677. The Court found that the value of any further post-deprivation remedy would not justify the cost. *Id.*

Here, there is similarly "every reason to believe" that outright refusals to issue a ticket to a trespassing vehicle would be an "aberration." *Id.* at 677. Property Owners provide no reason to believe why such derelictions would ever occur, or why resorting to another officer or another enforcement agency would not be easier, cheaper, faster and more effective. The Ordinance also preserves common law remedies against the actual depriver of Property Owners' rights—the law-breaking motorist. An aggrieved property owner can of course sue the offending vehicle owner for trespass, and receive a remedy which would not depend on whether or not a ticket was issued in compliance with the Ordinance. And just as in *Ingraham*, the value of any additional procedural safeguards does not outweigh the costs. *Id.* at 680.

The last step is to evaluate the length and severity of the deprivation created by the Ordinance. *Memphis Light*, 436 U.S. at 19. These factors weigh heavily against the Property Owners, primarily because the length of deprivation is brief. In *Goss v. Lopez*, the Supreme

Court ruled that lessened process was required before suspending a child from school for fewer than ten days, finding that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." 419 U.S. at 577. In *Memphis Light*, the length of deprivation could be months, and even a temporary cessation of essential utility services like electricity functioned as a "uniquely final deprivation." 436 U.S. at 20. Here, there is no potential for permanent dispossession, and the length of deprivation could be as little as ten minutes or even ten seconds. Additionally, *Goss* concerned a child's ability to attend school, *Memphis Light* concerned a citizen's access to necessary utilities, and *Ingraham* invoked a child's very right to bodily integrity. Property Owners here, although generally entitled to utilize their land as they see fit, must endure, perhaps, a temporary delay in their ability to eject a vehicle from their property. Municipal ordinances already encroach on such rights, *see* Phila. Code § 9-605(11) *et seq.,* and the right to make use of one's property is not unfettered. *Citizens for Personal Water Rights v. Borough of Hughesville,* 815 A.2d 15, 18 (Pa. Commw. Ct. 2002) (Property owners are afforded "a right to the reasonable use and enjoyment of their properties subject to reasonable regulations for the public good imposed under the police power of the state.").

The deprivation in question is more than *de minimis*, but not by much—it is not a "uniquely final deprivation" by any stretch of the imagination. *Memphis Light,* 436 U.S. at 20. The process required, therefore, is minimal. What the Ordinance provides is enough.

### III.    CONCLUSION

All roads reach their end: for the reasons outlined above, Defendants' Motion to Dismiss is granted.

s/Anita B. Brody

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:                    Copies **MAILED** on _____ to: